T.C. Memo. 1997-96

UNITED STATES TAX COURT

M.I.C. LIMITED, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

BEVERLY THEATERS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 3910-94, 15027-94.    Filed February 24, 1997.

<u>Robert E. Miller</u> and <u>Edith S. Thomas</u>, for petitioners.

<u>Alexandra E. Nicholaides</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Beverly Theaters, Inc. (Beverly) and M.I.C. Ltd. (MIC), petitioned the Court to redetermine respondent's determinations with respect to their Federal income taxes.

Respondent's determinations for MIC are reflected in a notice of deficiency dated December 8, 1993, and the determinations for Beverly are reflected in a notice of deficiency dated June 2, 1994.  Respondent's determinations are as follows:

M.I.C. Ltd.:  Docket No. 3910-94

| Taxable Year Ended January 31 | Deficiencies | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662 |
|---|---|---|---|
| 1990 | $349,589 | $87,397 | $69,918 |
| 1991 | 125,865 | 31,466 | 25,173 |

Beverly Theaters, Inc.:  Docket No. 15027-94

| Taxable Year Ended June 30 | Deficiency | Additions to Tax Sec. 6651(a)(1) | Sec. 6653(a) |
|---|---|---|---|
| 1989 | $335,744 | $95,250 | $20,100 |

Following consolidation of the cases for purposes of trial, briefing, and opinion, and following concessions by the parties, the primary issue before the Court is whether any portion of the $1,837,500 lump-sum award at issue herein must be recognized as gain by MIC and/or Beverly.  The award stemmed from a condemnation of property that was owned by MIC and leased to Beverly.  We hold that none of the award must be recognized as gain by MIC or Beverly.

We also must decide the following subsidiary issues:

1.  Whether MIC may deduct $65,000 in payments that it made to James Hafiz ($35,000), Peter Hafiz ($20,000), and Richard

Hafiz ($10,000) in connection with the condemnation.  We hold it may.

2.  Whether MIC is liable for additions to tax for the failure to file returns, as determined by respondent under section 6651(a)(1).  We hold it is to the extent described herein.

3.  Whether Beverly is liable for an addition to tax for the failure to file a return, as determined by respondent under section 6651(a)(1).  We hold it is not.

4.  Whether MIC is liable for the accuracy related penalties determined by respondent under section 6662.  We hold it is to the extent described herein.

5.  Whether Beverly is liable for the negligence addition to tax determined by respondent under section 6653(a).  We hold it is not.

Unless otherwise stated, section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and the exhibits submitted therewith are incorporated herein by this reference.  MIC was incorporated on March 2, 1973, and its principal place of business was in Durand, Michigan, when it petitioned the Court.  Beverly was incorporated on September 19, 1978, and its principal office was in St. Paul,

Minnesota, when it petitioned the Court.  Beverly was involved in the adult entertainment industry, and its operations were based in a multiuse, multimedia adult entertainment complex known as the Faust Entertainment Complex (the Faust).  The Faust included: (1) A store that sold adult books, videos, and paraphernalia, (2)  a location that featured live peep shows/rap parlor, (3) a stage for live entertainment, (4) individual booths for watching adult films, and (5) a full screen motion picture theater.  The Faust's daily operations were managed by the Hafiz family. James Hafiz, the family's patriarch, was Beverly's president, and his wife, Eleanor, and his sons, Peter, Richard, and Stewart, were Beverly employees.  Peter Hafiz was a full-time employee of Beverly, and his two brothers were part-time employees.

On March 31, 1972, Harry V. Mohney (Mohney) purchased property located at the corner of Dale Street and University Avenue in St. Paul, Minnesota, for $80,000.  St. Paul is a major manufacturing and distributing center in the upper Midwest, and University Avenue is a busy thoroughfare that connects the central business districts of St. Paul and Minneapolis.

Mohney transferred the property to MIC by warranty deed on November 14, 1977, and MIC owned the property at the times relevant herein.  MIC had expanded the property received from Mohney to include 626 University Avenue, and the land size of the parcels at 620 and 626 University Avenue totaled 14,520 square feet (hereinafter the property at 620 and 626 University Avenue

is collectively referred to as the Property).  A one story brick building and a three story brick building were situated at 620 University Avenue, and a 9,760 square foot theater-structure was situated at 626 University Avenue.  There was no parking lot on the Property.  Vehicles had to be parked on the street or across the street in a parking lot that accommodated approximately 500 vehicles.

The theater section of the structure at 626 University Avenue was one-story, and it had high ceilings, angled flooring, and a seating capacity of 394.  The structure's section fronting University Avenue had two floors.  The first floor contained a lobby and shopping space that was used by a barber shop.  The second story was used as an apartment and for storage.

The building at 620 University Avenue had 21,269 square feet.  The building's exterior was attractive, and it had unique features including ceramic tiles, cathedral-type window gables, and ceramic brick facade.  The building had undergone substantial remodeling and leasehold improvements, including individual booths, dance area, stages, lit staircases, an arcade, and total renovation of the store and arcade area.  A major remodeling in the 1980's included an updating of electrical, heating/air conditioning, and security systems, as well as remodeling the interior which included a new theater and screens, carpeting, and decorative lighting throughout.  The building was well adorned, very clean, attractive, well maintained, and in good condition.

MIC leased the Property to Beverly under a 5-year lease that ran from March 1986 to February 1991. The lease provided that Beverly would pay MIC rent at an annual rate of $3.42 per square foot, the landlord would pay the real estate taxes, and the tenant would pay all other property expenses. The Property was zoned B-3, General Business District, which permitted adult uses, including adult bookstores, cabarets, conversation/rap parlors, health/sports clubs, massage parlors, and motion picture theaters. The B-3 zoning also permitted the Property to offer more than one adult use at that site. The Property enjoyed value due to its zoning, location, traffic, and its ability to offer a number of adult uses at one site.

In the early 1980's, the City of St. Paul (the City) had begun to make a sweeping attempt to drive out of the City all adult oriented businesses. The first business owner to be subjected to the City's scrutiny was Ferris Alexander (Alexander), an owner and operator of a number of adult related bookstores, bars, theaters and other entertainment facilities in St. Paul. One of Alexander's assets was the Flick Theater (the Flick), a 9,760 square foot establishment that offered the same types of adult entertainment as the Faust. The Flick, which was situated across the street from the Faust, was in worse physical condition than the Faust. The Flick was rundown and "seedy", and it had limited usable footage.

The City purchased an option from Alexander in December 1983 to buy the Flick for $300,000 within the next 4 years. The option stated that the purchase price would increase to $750,000 if the City "adopts an ordinance which regulates adult entertainment and prohibits such activity outside an area having a new zoning classification enacted specifically for such purposes, and which ordinance grants or has granted a non-conforming use or "grandfather" status to the current use of the Optioned Property at the time of the exercise of the Option". The City exercised its option to purchase the Flick on or before the December 1987 expiration date, and, following extensive litigation that prolonged the 4-year period in which the City would have otherwise had to purchase the Flick, purchased the Flick in or about the summer of 1989 for $300,000. When the City exercised its option to buy the Flick, the City had not yet passed the type of ordinance that would have increased the purchase price to $750,000. In mid-1988, the City passed such an ordinance. At that time, the City amended its zoning code to include distance restrictions from other adult uses, residential property, day care, churches, libraries, parks, hotels, and fire stations. The amendments also prohibited additional multiplexing of adult entertainment uses at one site. The Property was "grandfathered" from these amendments, and this grandfathered status ran with the land in that it was transferable to any owner of the Property. Following these amendments, the Faust was the

only multiuse, multimedia adult entertainment complex operating within the City.

In 1985, the City had approached MIC and Beverly and attempted to negotiate an agreement to purchase the Property. An initial meeting was held in May 1985, and the City made an offer based on what it stated was the fair market value of the Property. The City stated that the Property was worth less than $700,000. The City later obtained an appraisal that stated that the Property was worth $723,000.

Petitioners rejected the City's offer. Petitioners then obtained two appraisals that respectively stated that the Property was worth $1,950,000 and $2,100,000. On December 9, 1987, the City notified petitioners that it would acquire title to the Property by condemnation, and, shortly thereafter, the City petitioned the local court to condemn the Property by eminent domain. The City named as respondents in the petition all persons and entities that had, or could have had, a claim to any interest in the Property. The respondents listed in the petition included MIC, Beverly, and certain other persons who are not relevant to our case.

The court assigned the case to a panel of three commissioners to ascertain the condemnees' award. Before the commissioners independently ascertained an award, the parties to the condemnation proceeding settled their dispute. The settlement, which occurred in January 1989, followed

approximately 13 months of heated and contested court proceedings and discussions related thereto.  Under the terms of the settlement, the City agreed to deliver a $1,837,500 check to MIC in satisfaction of all claims that could be made with respect to the Property's condemnation.  The City prepared a written settlement agreement that was signed by the City, on the one hand, and MIC, Beverly, and James, Eleanor, Peter, Richard, and Stuart Hafiz, on the other.  The agreement, dated February 14, 1989, stated that the parties thereto agreed that the settlement resolved all claims, including the value of the real estate, going concern value, and covenants by MIC, Beverly, and the Hafiz family not to operate an adult business in the area.  The agreement did not set forth a value for any specific claim.  Petitioners and the Hafiz family were advised there was little value to the covenants.

On February 14, 1989, the commissioners filed with the court an award of damages in the amount of $1,837,500.  The commissioners set their award at the amount listed in the settlement agreement.  On February 16, 1989, MIC transferred the Property to the City by quitclaim deed, and, on March 3, 1989, MIC received a check payable solely to it in the amount of $1,837,500.  There was no deed or bill of sale given for goodwill or going concern value.  On its 1989 Form 1120, U.S. Corporation Income Tax Return, which MIC filed with the Commissioner on January 3, 1992, MIC reported that it had received the $1,837,500

condemnation award in 1989, and that it realized a $1,789,785 gain with respect thereto ($1,837,500 award less $47,715 adjusted basis). MIC reported that it was electing not to recognize this gain in accordance with section 1033, and that it had purchased other property similar to or related in use in an amount greater than the gain.

MIC retained James, Peter, and Richard Hafiz to assist MIC during the condemnation proceedings, and James Hafiz negotiated with MIC's management the amount of compensation that he and his sons would receive for their assistance. MIC sought assistance from people with personal knowledge of the Property, and James, Peter, and Richard Hafiz made themselves available to assist appraisers and counsel as necessary. James, Peter, and Richard Hafiz also performed various jobs to enhance the value of the Property. Peter Hafiz, who had attended college to learn architectural drafting and art, sketched MIC's real estate and fixtures, and he diagramed the building's interior. Peter Hafiz worked more hours than Richard Hafiz.

On April 24, 1989, MIC paid James, Richard, and Peter Hafiz lump-sum amounts for their services. MIC paid nothing to Eleanor or Stuart Hafiz because they did not perform any services for MIC in connection with the condemnation. Respectively, James, Richard, and Peter Hafiz received $35,000, $10,000, and $20,000. MIC issued each of these men a 1989 Form 1099-MISC, Miscellaneous Income, for the amount that it paid him. MIC deducted the

$65,000 in payments on its 1989 Form 1120 as "C.L.--Management Fees".

Respondent determined that MIC had to recognize $1,162,215 of the $1,837,500 condemnation award in its 1989 taxable year. Alternatively, respondent determined, Beverly had to recognize $1,114,500 of the condemnation award in its 1988 taxable year.[1] Respondent also determined that MIC could not deduct the $65,000 that it claimed as "Contract Labor Management" in its 1989 taxable year because "it has not been established that any amount claimed constitutes an ordinary and necessary business expense, was expended or was expended for the purpose designated."

Modern Bookkeeping Service provided bookkeeping services for petitioners.

The City demolished the Property in July 1995.

OPINION

We first decide whether the City paid any part of the condemnation award for an interest other than the Property. Where a lump-sum condemnation award consists entirely of compensation for property taken, this Court has held in certain circumstances that the award may not be allocated among the various items of property involved. Asjes v. Commissioner,

---

[1] The only other adjustment that respondent made to Beverly's 1988 taxable year concerned net operating loss (NOL) carrybacks. Respondent carried back NOL's from Beverly's 1989, 1990, and 1991 taxable years to offset part of the increased income that respondent determined was taxable to Beverly on account of the condemnation award.

74 T.C. 1005, 1010-1011 (1980); Kendall v. Commissioner, 31 T.C. 549, 554 (1958); Bymaster v. Commissioner, 20 T.C. 649, 653-654 (1953); Allaben v. Commissioner, 35 B.T.A. 327, 328 (1937); see also Lapham v. United States, 178 F.2d 994, 996 (2d Cir. 1950). As this Court has stated, "a lump sum purchase price is not to be rationalized after the event of sale as representing a combination of factors which might have been separately stated in the contract if the parties had seen fit to do so." Bymaster v. Commissioner, supra at 653-654.

The result is different, however, when the condemnation award is actually compensation for nonproperty items, such as interest or a waiver of legal rights. The fact that an award includes compensation for nonproperty rights may be evidenced by the award's being significantly in excess of the value of the property taken. In such a case, the Court has allocated part of the award to the nonproperty interests. See Smith v. Commissioner, 59 T.C. 107 (1972); see also Estate of Walter v. Commissioner, T.C. Memo. 1971-244.

The primary argument in respondent's brief is that MIC is taxable on $1,017,500 (rather than $1,162,215 as shown in the notice of deficiency) of the condemnation award because the award included damages for going concern value and certain covenants. Respondent states that this amount is taxable to MIC because MIC was the party that actually received and used the proceeds from the award. Respondent does not contest that $820,000 of the

condemnation award qualifies under section 1033 for nonrecognition of gain. Respondent alternatively argues that $908,750 (rather than $1,114,500 as shown in the notice of deficiency) of the award is taxable to Beverly, $800,000 as a payment for its going concern and $108,750 as a payment for its covenants, and that $108,750 of the award is taxable to MIC as a payment for its covenants. Under her alternative argument respondent does not contest that $820,000 of the condemnation award qualified under section 1033 for nonrecognition of gain.

We disagree with both of respondent's arguments. We decline to allocate any part of the award away from the Property because we find that the award is not significantly in excess of the fair market value of the Property. Fair market value is a question of fact. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., 304 U.S. 282, 294 (1938). Fair market value represents the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being compelled to buy or to sell. United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989). The willing buyer and the willing seller are hypothetical persons, instead of specific individuals or entities, and the characteristics of these hypothetical persons are not necessarily the same as the personal characteristics of the actual seller or a particular buyer. Estate of Bright v.

<u>United States</u>, 658 F.2d 999, 1005-1006 (5th Cir. 1981); <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. 193, 218 (1990).

Fair market value is determined as of the valuation date,[2] and no knowledge of unforeseeable future events that may affect the value is imputed to the hypothetical persons. See, e.g., <u>Estate of Newhouse v. Commissioner</u>, <u>supra</u> at 218. Fair market value equals the highest and best use of the property on the valuation date. Fair market value takes into account special uses that are realistically available due to the property's adaptability to a particular business. <u>Mitchell v. United States</u>, 267 U.S. 341, 344-345 (1925); <u>Stanley Works v. Commissioner</u>, 87 T.C. 389, 400 (1986). Fair market value is not necessarily affected by whether the owner has actually put the property to its highest and best use. The reasonable and objectively possible uses for the property control the valuation thereof. <u>United States v. Meadow Brook Club</u>, 259 F.2d 41, 45 (2d Cir. 1958); <u>Stanley Works v. Commissioner</u>, <u>supra</u> at 400.

---

[2] The parties have not set forth their positions concerning the date as of which the Court should value the Property. We value the Property as of Feb. 14, 1989; i.e., when the commissioners filed their award with the State court. As stated by the Minnesota Supreme Court, a condemnee is entitled to compensation equal to the "damages assessed as of the date the commissioners file their award and with respect to the value and condition of the property at that time." <u>Iowa Elec. Light & Power Co. v. Fairmount</u>, 67 N.W.2d 41, 46 (Minn. 1954); see also <u>In the Matter of Branch A-38, JT Ditch No. 204 v. County of Martin</u>, 406 N.W.2d 524, 525 (Minn. 1987); <u>St. Louis Park v. Almor Co.</u>, 313 N.W.2d 606, 609-610 (Minn. 1981).

Our determination of fair market value has been assisted by the experts in this case. Respondent's expert was Robert J. Strachota (Strachota), President of the Shenehon Co. Petitioners' expert was Robert J. Lunieski (Lunieski), President of Lunieski & Associates. We are not bound by an expert's opinion, Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139, and we may adopt or reject an expert's opinion in its entirety if we believe it appropriate, Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938). We also may select only the portions of an expert's opinion that we choose to adopt. Parker v. Commissioner, 86 T.C. 547, 562 (1986).

Strachota performed a "retrospective market value appraisal" of the Property in July 1995, shortly after its demolition. Strachota did not physically inspect the Property; he relied on the descriptions of the Property that were set forth in three appraisals, two of which valued the Property as of January 5, 1989, and the third as of February 26, 1988. Strachota ascertained that the highest and best use of the Property was as a multiplex adult entertainment facility, and that the zoning ordinances added value to the Property. Strachota concluded that the fair market value of the Property on March 1, 1989, was $800,000. Strachota reached his conclusion by estimating that the Property's value was $600,000 under the "cost approach", and

$800,000 under both the "sales comparison" and "income capitalization" approaches.

Strachota estimated the value of the Property under the cost approach by ascertaining the "current cost to reproduce or replace the existing structure, deducting for all accrued depreciation in the property, and adding the estimated land value." Strachota computed his $600,000 value under this approach without taking into account any premium on account of the zoning advantage enjoyed by the Property.

Strachota estimated the value of the Property under the sales comparison approach by "comparing the * * * [Property] to similar properties that may have been sold recently, applying appropriate units of comparison, and making adjustments, based on the elements of comparison, to the sale prices of the comparables." Strachota computed his $800,000 value under this approach by relying primarily on a February 1993 sale of a 13,964 square foot adult entertainment establishment in Minneapolis, Minnesota. Apart from this sale, Strachota concluded, no other sales were comparable to the Property.

Strachota estimated the value of the Property under the income-capitalization approach by "converting anticipated benefits into property value"; i.e., capitalizing the Property's income expectancy to arrive at its value. In applying the income approach, Strachota considered commercial rents ranging from $1.50 to $18 per square foot, and selected a $5 figure as the

Property's "market rent".  Strachota multiplied this $5 figure by the Property's square footage (21,269) and applied a 5-percent vacancy and credit loss to arrive at a "potential gross rental income" of $101,028.  Strachota subtracted $6,832 of operating expenses from the potential gross rental income, and he divided the result ($94,196) by a 12-percent capitalization rate to arrive at his value of $800,000 (with rounding).  Strachota concluded that the income approach was the most reliable indicator of the Property's fair market value under the facts at hand and, hence, he concluded, the Property was worth $800,000.

Lunieski appraised the Property for the condemnation proceeding, concluding that the fair market value of the Property was $1,950,000 as of January 5, 1989.[3]  Lunieski inspected the Property on at least five occasions, and he consulted an attorney who was experienced with the City's adult zoning and ordinances.  Lunieski concluded that because the Property had a centralized location and advantageous zoning, a prospective renter would pay a premium to lease the property.  Lunieski concluded that the City's ordinances enhanced the value of the Property, and that the Property's highest and best use was rental to an adult entertainment entity that was qualified to operate a complex.

In arriving at his conclusion of fair market value, Lunieski considered the same valuation approaches considered by Strachota.

---

[3]Lunieski's appraisal was one of the three appraisals on which Strachota relied.

Lunieski concluded that the cost approach was not helpful to him in ascertaining the Property's fair market value because "no substitute property could be constructed with the same zoning and multiple use as the subject". Lunieski concluded that the sales comparison approach was also of no benefit because "any market data would not reflect the unique zoning surrounding the subject property." Lunieski concluded that the income-capitalization approach was the only approach that could be used to estimate the Property's fair market value.

In applying the income approach, Lunieski reviewed market rentals and concluded that the appropriate range of market rentals was $9 to $18 per square foot. Lunieski ascertained that the gross potential rent would be approximately $14.50 per square foot, and, based on this figure, estimated net operating income at $275,000 ($14.50 multiplied by the Property's 21,269 square feet). Lunieski used a 14-percent capitalization rate, and concluded that the fair market value of the Property was approximately $1,950,000 ($275,000/14 percent with rounding). Lunieski did not factor in a vacancy and credit loss because, he ascertained, the Property had 20 years of rental history without a vacancy.

We find both experts to be helpful in understanding the industry, but we do not accept either expert's conclusion as to the Property's fair market value. In contrast with the belief of both experts, we believe that the sales comparison approach can

be applied to the facts herein, and that the sales comparison approach is the best method of valuation under our facts. The sales comparison approach is premised on the common sense technique of finding the actual sales prices of properties similar to the subject property and relating these actual prices to the subject property to determine its value. Given the fact that the location, structure, and use of the Flick practically mirrored the location, structure, and use of the Faust, we are persuaded that the Flick is sufficiently similar to the Faust to use the sale of the Flick for comparison purposes. We believe that the $750,000 price that the City would have paid for the Flick, had the 1988 amendments to the zoning code been passed when the City exercised its option in 1987, is the most accurate measure of the Property's fair market value. Lunieski's report does not reference the sale of the Flick as a comparable property. Strachota's report does. Strachota states in his report that the sale of the Flick "would have possible relevance" but for the fact that "it was bought by a governmental agency". Neither Strachota nor respondent, however, explains adequately why the fact that the Flick was bought by a governmental agency should eliminate that sale as an accurate measure of the fair market value of the Property. Although it is true that a governmental agency bought the Flick, the agency still had to pay fair market value for it. The City acquired the Flick from Alexander under the threat of condemnation. If the City had been

forced to condemn the Flick, it is indisputable that the City would have had to pay fair market value for the property. See Ramsey County v. Miller, 316 N.W.2d 917 (Minn. 1982); see also State v. Holmberg, 384 N.W.2d 214, 216 (Minn. Ct. App. 1986). We do not see why the City would have had to pay any more or less for the Flick simply because Alexander sold the Flick to the City through a negotiated sale.

We can think of no good reason why the selling price of the Flick is not a good measure of the fair market value of the Property. But for its size and appearance, we find that the Flick was similar in most regards to the Faust. Although it is true that the actual purchase price of the Flick did not reflect a premium value for advantageous zoning, it is equally true that Alexander and the City contemplated the possibility that the Flick's value would increase on account of the passage of zoning that was favorable to the Flick's owners. The option provides that the purchase price of the Flick will increase to $750,000, if the City enacts ordinances that would otherwise have given the property on which the Flick was situated a form of monopoly.

The Property, as recognized by both experts, enjoyed a form of monopoly at the time of its condemnation on account of its grandfathered status. Assuming that the Flick had similar status and that the City had been required to pay $750,000 for the Flick, we calculate that the City would have paid $76.844 for each square foot of the Flick. Given this rate, as well as the

square footage of the Property (21,269), we calculate that the fair market value of the Property was worth no less than $1,634,395 on the relevant valuation date.  We need not quibble with the difference between the $1.634 million figure that we have just calculated and the $1,837,500 award paid by the City for the Property.  Suffice it to say that the Property was in better shape than the Flick, and it is reasonable to conclude that the City would have paid slightly more on a square footage basis for the Property than it did for the Flick.  We find and hold that the award is not significantly in excess of the value of the Property.  Accordingly, we also hold that none of the award must be recognized by MIC as gain for the relevant year, and that none of the award is includable in Beverly's gross income.

Turning to the $65,000 contract labor expense reported by MIC, we are persuaded that MIC can deduct this amount.  We find from the record that MIC paid $65,000 to James, Peter, and Richard Hafiz, and that MIC paid this amount to compensate the men for their time and efforts in connection with the City's condemnation of the Property.  In addition to the fact that the three men performed valuable services for MIC, for which they were entitled to be compensated, we believe that it was reasonable for MIC to pay these men for the time that they spent on-call to provide advisory services as needed.  See Yelencsics v. Commissioner, 74 T.C. 1513, 1524-1525 (1980).  We

conclude that MIC's payment of these amounts qualifies as an ordinary and necessary business expense under section 162. The expense was ordinary and necessary mainly because it bore a reasonable and proximate relation to MIC's business. See Trust of Bingham v. Commissioner, 325 U.S. 365, 370 (1945); see also Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Deputy v. Du Pont, 308 U.S. 488, 495 (1940). We do not sustain respondent's determination on this issue.

Respondent also determined additions to tax under section 6651(a)(1), asserting that MIC and Beverly failed to file timely Federal income tax returns. The record clearly establishes that MIC's 1989 and 1990 Forms 1120 were filed untimely, as was Beverly's 1988 Form 1120. Thus, in order to avoid these additions to tax, MIC and Beverly must each prove that its failure to file timely was: (1) Due to reasonable cause and (2) not due to willful neglect. Sec. 6651(a); Rule 142(a); United States v. Boyle, 469 U.S. 241, 245 (1985); Catalano v. Commissioner, 81 T.C. 8 (1983), affd without published opinion sub nom. Knoll v. Commissioner, 735 F.2d 1370 (9th Cir. 1984). A failure to file timely is due to reasonable cause if the taxpayer exercised ordinary business care and prudence, and, nevertheless, was unable to file the return within the prescribed time. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Willful neglect means a conscious, intentional failure, or reckless indifference. United States v. Boyle, supra at 245.

Following our review of the record, we are unpersuaded that either MIC or Beverly exercised ordinary business care and prudence in an attempt to file its tax returns timely. We hold that MIC and Beverly are liable for these additions, and we sustain respondent's determination of the applicability of these additions. The amount of these additions is left to be computed under Rule 155.

Respondent also determined that MIC is liable for accuracy-related penalties under section 6662. Section 6662 imposes a penalty equal to 20 percent of the underpayment attributable to negligence. MIC bears the burden of proving respondent wrong. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). MIC must prove that it was not negligent; i.e., it made a reasonable attempt to comply with the provisions of the Code, and that it was not careless, reckless, or in intentional disregard of rules or regulations. Sec. 6662(c).

Respondent determined that MIC was liable for an accuracy-related penalty in each year with respect to 100 percent of the deficiency. MIC conceded the correctness of certain of respondent' adjustments in this case, and it has failed to prove that the penalty does not apply to any deficiencies attributable to the conceded items. We hold that MIC has failed to meet its burden or proof, and we sustain respondent's determination on the

applicability of these penalties.  The amount of these penalties is left to be computed under Rule 155.

Respondent also determined that Beverly is liable for an addition to its 1988 tax for negligence.  See sec. 6653(a). Section 6653(a) imposes an addition to tax equal to 5 percent of the underpayment attributable to negligence.  For this purpose, negligence is defined similarly to the definition set forth above for section 6662.  The failure to file timely a tax return is prima facie evidence of negligence.  Emmons v. Commissioner, 92 T.C. 342, 349 (1989), affd. 898 F.2d 50 (5th Cir. 1990). Beverly bears the burden of proving respondent wrong.  Rule 142(a);  Welch v. Helvering, supra.

We hold that Beverly has not met the burden of proof, and we sustain respondent's determination on the applicability of this addition to tax.  The amount of this addition to tax is left to be computed under Rule 155.

We have considered all arguments made by the parties for contrary holdings and, to the extent not discussed above, find them to be irrelevant or merit.

To reflect the foregoing,

Decisions will be entered

under Rule 155.